UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| NORMAN BRIAN WONG, | ) | Adversary Case No. 19-00653 |
| | ) | |
| Debtor. | ) | Ch. 13 |
| _____ | ) | |
| | ) | Judge A. Benjamin Goldgar |
| JOHN WRZESINSKI, | ) | |
| | ) | (Lake County) |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NORMAN BRIAN WONG, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S ANSWER TO PLAINTIFF'S FIRST AMENDED COMPLAINT**

NOW COMES defendant, Norman Brian Wong ("defendant"), by and through his attorney, Michael W. Huseman of Dreyer, Foote, Streit, Furgason & Slocum, P.A., and for his Answer to Plaintiff's First Amended Complaint, hereby states as follows:

JURISDICTION

1. On January 13, 2019 the Debtor filed a voluntary petition for relief under Chapter 13 of Title 11 of the U.S. Bankruptcy Code in the Northern District of Illinois, Eastern Division, which is captioned above.

**RESPONSE:** Denied. Defendant filed his Chapter 13 petition on January 23, 2019.

2. Plaintiff is listed as a creditor on Debtor's amended Schedule E/F in his Petition.

**RESPONSE:** Admit.

3. On March 4, 2019 a duly noticed meeting of creditors was held.

**RESPONSE:** Admit.

4. As of the date of this Complaint the Debtor has not been granted a discharge.

**RESPONSE:** Admit.

5. This Complaint is timely because the date by which a Complaint objecting to Debtor's discharge or to determine the dischargeability of a debt expires on May 19, 2019; and the original Complaint was filed prior thereto.

**RESPONSE:** Defendant denies that the date by which a complaint objection to discharge or dischargeability was May 19, 2019; however, defendant admits that this Complaint was timely filed.

6. This is an adversary proceeding in which the plaintiff-creditor is seeking a determination as to the dischargeability of a debt owed by the debtor to plaintiff-creditor under Bankruptcy Code § 523(a)(2)(A) and/or (B).

**RESPONSE:** Admit.

7. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334 and the Bankruptcy Code, 11 U.S.C. §§ 523 and 727. This matter is a core proceeding pursuant to 28 U.S.C. § 157 (b)(1), (b)(2).

**RESPONSE:** Defendant denies the applicability of 11 U.S.C. § 727, but admits the remaining allegations of this paragraph.

## PARTIES

8. Plaintiff is an individual, residing in LaGrange Park, IL, which is within the jurisdictional boundaries of this Court.

**RESPONSE:** Defendant lacks sufficient information with which to admit or deny the allegations of this paragraph.

9. Plaintiff is a judgment creditor of the Debtor, in addition to claiming the debt set forth in this adversary proceeding.

**RESPONSE:** Admit.

10. Defendant is the Debtor in the captioned case, and at all relevant times is believed to have lived within the jurisdictional boundaries of this Court.

**RESPONSE:** Admit.

## LITIGATION HISTORY

11. The Parties have litigated the issues and allegations raised in this Complaint in the Cook County case ever since September 27, 2016. The matters raised in this adversary Complaint were set for trial on the few issues remaining un-admitted by WONG in Cook County when Debtor filed his Voluntary Petition, thereby staying the Cook County litigation and trial assignment that was to be forthcoming the Monday following WONG's bankruptcy filing herein.

**RESPONSE:** Defendant admits that plaintiff sued him in Cook County, Illinois on September 27, 2016. Defendant further admits that the Cook County case was set for trial when he filed bankruptcy. Defendant denies the remaining allegations contained in this paragraph.

12. WRZESINSKI obtained a judgment against WONG on July 19, 2018 in the Circuit Court of Cook County, Illinois, Case No. 2016 CH 12736, in the amount of $50,000.00 plus costs, interest, and attorney's fees (hereafter the Cook County Litigation or Case). A Proof of Claim Form 410 was filed for this debt on March 11, 2019. The Court may note that WONG failed to list this personal judgement against him in his original Form 101 Petition, Schedule E/F, in the Bankruptcy herein, Case. 19-1982, Doc. 1; and failed to list WRZESINSKI, who had current, pending litigation against him, as a person who must be notified of the filing.

**RESPONSE:** Defendant admits that a judgment was entered against him on July 19, 2018 for breach of a guarantee on a promissory note. Defendant further admits that plaintiff filed a proof of claim on March 11, 2019. Defendant denies the remaining allegations of this paragraph.

13. The foregoing debt and judgment arose from a personal guarantee given by Defendant / Debtor to Plaintiff / Creditor, as detailed more fully herein.

**RESPONSE:** Admit.

FACTS

14. During the late Winter and Spring of 2015, WRZESINSKI began taking dance lessons from WONG at the business operated by WONG as a sole proprietor called "Chicago Dance Factory", located in Villa Park, Illinois.

**RESPONSE:** Admit.

15. During that time period, WONG had informed WRZESINSKI that WONG was seeking investors in a new business venture he was starting. That venture was described as a

combination dance studio, bistro, and wine bar. The location proposed by WONG was in Palatine, Illinois.

**RESPONSE:** Admit.

16. In the Spring of 2015 WONG asked WRZESINSKI if WRZESINSKI might be interested in becoming an "investor" in this business venture - the dance studio, bistro, and wine bar. As part of this inquiry, WONG presented to WRZESINSKI a document called "Chicago Dance Factory, LLC Business Summary" which was also titled, on another page, as "Chicago Dance Factory Investment Opportunity" (referred to herein as the Prospectus, which is attached as Exhibit A).

**RESPONSE:** Admit.

17. This Prospectus described the proposed venture generally thusly: "Primary business (Chicago Dance Factory) will focus on building a monthly membership base of dance students taking private and group dance lessons. Secondary business is the Wine Bar [sic] (the Kat's Meow) which will also act as a service bar for all school activities." (See Exhibit A, The Prospectus).

**RESPONSE:** Admit.

18. The Prospectus then lists various levels of investment that WONG was soliciting. The "Investment Opportunity" is described in the Prospectus as:

"Chicago Dance Factory currently generates enough monthly revenue to pay for projected expenses of the new location. However, at this time, additional revenue [sic] is needed to complete the build out in addition to the $40,000 Brian Wong has already invested into the project."

**RESPONSE:** Admit.

19. The Prospectus provided by WONG then lists the purpose for which the prospective investor's funds would be used, to wit:

"Studio: Dance floor; mirrors; signage; windows display ad covers; Decor; Marketing; Sound System. The Kat's Meow: tables & chairs & love seats; Decor; Glasses, Cups, Silverware, etc.l POS software (computers already purchased); equipment: coffee machine, refrigerated cases, register, taps; liquor, coffee, food initial inventory; Coke dispenser and syrup boxes; lighting."

**RESPONSE:** Admit.

20. The Prospectus provided by WONG then set up various levels of investor participation in the venture, including "Investor Option 1" which is detailed in the Prospectus as:

"$50,000 Loan to Chicago Dance Factory, LLC with 100% Payback + 10% APR
Loan guaranteed by Brian Wong and Midwest Direct, LLC
Payback period to commence 6 months after Grand Opening (April 2016?)
Interest Options at 10% APR:
    36 months - $1,613.36 / month payment
    Total interest = $8,080.94 (Total Return of $58,080.04)
    48 months - $1,268.13 / month payment
    Total interest = $10,870.20 (Total Return of $60,870.20)
    60 months - $1,062.35 / month payment
    Total interest = $13,741.13 (Total Return of 63741.13)"

**RESPONSE:** Admit.

21. WRZESINSKI and WONG held several discussions whereby WRZESINSKI asked WONG several specific questions about how the investment would work.

**RESPONSE:** Admit.

22. For example, on or about May 15, 2015 in a meeting at the Omega Restaurant in OakBrook Terrace, Illinois, WRZESINSKI met with WONG to discuss WRZESINSKI's potential investment in the project. At that meeting WRZESINSKI asked WONG what the lease terms were

for the studio space, and related to WONG his concerns about getting stuck in a long term lease with increasing payments. WONG did not give WRZESINSKI a satisfactory response about the lease at that meeting, and WRZESINSKI deferred making a decision.

**RESPONSE:** Admit.

23. A few days later, WRZESINSKI told WONG that he was declining making the investment because of the uncertainty of the lease terms, for the reason that specifically but not verbatim, WRZESINSKI's father (when WRZESINSKI was younger), who owned a T.V. repair business, got stuck in a lease where the landlord repeatedly raised the rent to the point where it became oppressive and unprofitable; and that WRZESINSKI did not want to get similarly stuck because he saw first-hand the damaging economic effects such a situation could have on a business and the owner's (his father) family.

**RESPONSE:** Denied.

24. On May 31, 2015, WONG sent a text message to WRZESINSKI stating, verbatim, "rent should be double what were [sic] paying... Guys [sic] locked it in for 10 years with only a 3% increase every 2 years…" ("Guy" being the landlord of the ostensibly proposed commercial studio space). He further sent a text message to WRZESINSKI stating, verbatim, "$4k for 4500sqft... Including tax and cam is about $6 a foot…" and "Freaking amazing!"

**RESPONSE:** Admit.

25. Unknown to WRZESINSKI, at the time WONG sent this text statement to WRZESINSKI, and in fact, at the time WRZSINSKI and WONG met at the Omega Restaurant as alleged above, WONG had already entered into a lease agreement for studio space in furtherance

of the Project, said lease being signed by WONG two months earlier on April 1, 2015 (the "Studio Lease" herein, which is attached as Exhibit C), for a space at 761 N. Quentin Rd., Palatine, IL.

**RESPONSE:** Denied.

26. The terms of that lease for 761 N. Quentin differed materially and substantively from those represented by WONG in the text messages, in that the actual lease was for a two year initial period, rent of $4,000 per month, property taxes included except that if property taxes increased during that period, the rent would increase in the amount of said property tax increase; that the lease could then be renewed for two more two year periods with a 3% increase in rent each renewal, but that the tenant (CHICAGO DANCE FACTORY LLC) would also then be responsible for the studio's property taxes for the renewal period in addition to the base rent.

**RESPONSE:** Denied.

27. Specifically, the April 1, 2015 Studio Lease provides: "Lessee shall be responsible for the payment of a proportionate share of the annual real estate taxes which are assessed against the Center and which are payable during a year of this Lease … If during the initial term hereof, or during any renewal term, the annual real estate taxes which are assessed against the Center and which are payable during a year of this lease shall exceed the real estate taxes [which] are assessed against the Center for the previous calendar year, the basic rental to be paid by Lessee for such Lease year will be increased" in proportion to the square footage of the leased space.

**RESPONSE:** The unsigned lease attached as Exhibit C to plaintiff's complaint speaks for itself.

28. In direct reliance on the May 31st text message from WONG, combined with reliance on the oral statements of Wong, and from the Prospectus referred to above about WONG having invested $40,000.00 of his own money into the project, and that WONG and "Midwest Direct LLC" would guarantee repayment of the loan, and that proceeds from the "wine bar" would help to repay the loan, WRZESINSKI changed his mind about investing with WONG and in CHICAGO DANCE FACTORY LLC, and proceeded to work with WONG to make such investment.

**RESPONSE:** Defendant lacks sufficient information with which to admit or deny the allegations of this paragraph.

29. WRZESINSKI and WONG ultimately entered into an agreement at the "Investor Option 1" level noted above, wherein WRZESINSKI would lend $50,000.00 to WONG and DANCE FACTORY LLC in accordance with the terms of "Investor Option 1" in the Prospectus, except that repayment was to begin the month following the signing of the deal.

**RESPONSE:** Defendant admits that plaintiff loaned $50,000 to Dance Factory, LLC, but denies the remaining allegations of this paragraph.

30. To that end, and in reliance on the statements made by WONG related to the lease, and the statements in the Prospectus, all detailed above, WRZESINSKI entered into a "Promissory Note" on June 25, 2015 under the 60-month option of Investor Option 1 from the Prospectus, wherein he lent $50,000.00 to CHICAGO DANCE FACTORY LLC.

**RESPONSE:** Defendant admits that plaintiff entered into the promissory note attached as Exhibit B to the Complaint, but denies the remaining allegations of this paragraph.

31. WONG personally guaranteed payment on the Promissory Note, signing it as an accommodation party pursuant to the Illinois Uniform Commercial Code, and as pledged in the Prospectus. The Accommodation signed by WONG states specifically but not completely:

"The undersigned Brian Wong (the accommodating party), as consideration to induce John Wrzesinski to extend financial considerations to CHICAGO DANCE FACTORY LLC (the accommodated party) including the loan and Promissory Note executed concurrently herewith, irrevocably and unconditionally agrees to the faithful and timely payment when due under the terms of said Promissory Note. All provisions of the Promissory Note are incorporated herein by reference and are intended to apply equally to the accommodating party as if named therein, including those pertaining to late payments, acceleration, and confession of judgement."

(See Exhibit B, the Promissory Note).

**RESPONSE:** Defendant admits that he signed the "Accommodation" document attached to the promissory note, but denies the remaining allegations of this paragraph.

32. Neither WONG nor CHICAGO DANCE FACTORY LLC obtained any guarantee of repayment of the loan from "Midwest Direct LLC" or any other similar such entity.

**RESPONSE:** Denied.

33. Subsequent discovery in the Cook County Case has shown that "Midwest Direct LLC" was a sham company set up by WONG and wholly owned by WONG that had no other purpose other than being listed as guarantor on the Prospectus. It was never in the business of guaranteeing loans, and it never guaranteed a loan, the subject loan or otherwise.

**RESPONSE:** Denied.

34. In reliance on the foregoing statements and statements made during the course of the relationship between the Parties, WRZESINSKI gave to WONG the initial $50,000.00 loan amount, and then subsequent funds to try to salvage his investment, for a total of $110,000.00.

**RESPONSE:** Denied.

35. The foregoing statements by WONG were false, misleading, fraudulent, and made by WONG with the intent to deceive WRZESINSKI and to induce him to turn over this money, because:

 a. Wong never invested $40,000 of his own money into the project despite the Prospectus saying so. In fact it appears through discovery that Wong may not have invested any of his own funds.

 b. Wong never intended to personally guarantee payment on the loan, as shown by financial and bank statements obtained in the Cook County suit via subpoena showing that WONG did not have sufficient assets or income to guarantee the payments at the time the promise was made nor subsequently thereafter.

 c. Midwest Direct LLC was never a guarantor of the loan nor was it even in the guarantee business; it was actually a bogus, unfunded shell company with Wong himself as the sole member, which he put out to the public and Wrzesinski as if it was in the guarantee business and capable of guaranteeing the subject loan.

 d. No guarantee of the loan was ever obtained from Midwest Direct LLC, nor was any attempt even made to obtain a guarantee of the loan from Midwest Direct LLC.

 e. The lent funds were never going to be used for the items set out in the prospectus; rather Wong always intended to use them for his own personal debts and not furnishings as shown by the fact that he almost immediately spent the initially lent monies on his own personal credit card and other debts and not furnishings as set out in the Prospectus; and the fact that they never were spent on the items listed in the Prospectus.

 f. The Lease signed by Wong, which preexisted the Prospectus, prohibited the sale of alcohol thus there never could have been a wine bar at that location. Therefore "wine and liquor sales" as stated in the Prospectus as a source of revenue for repaying the loan could never have contributed to paying back the loan.

 g. The text messages from WONG directly contradicted the lease terms.

 h. None of Wrzesinski's lent funds (out of the entire $110,000) were ever spent for "Dance floor; mirrors; signage; windows display ad covers; Decor; Marketing; Sound System.

The Kat's Meow: tables & chairs & love seats; Decor; Glasses, Cups, Silverware, etc.; POS software (computers already purchased); equipment: coffee machine, refrigerated cases, register, taps; liquor, coffee, food initial inventory; Coke dispenser and syrup boxes; lighting" as promised in the Prospectus.

**RESPONSE:** Denied.

36. On that date, WRZESINSKI gave $50,000.00 to CHICAGO DANCE FACTORY LLC pursuant to the Promissory Note and personal guarantee.

**RESPONSE:** Defendant admits that plaintiff loaned $50,000 to Chicago Dance Factory, LLC, but denies the remaining allegations of this paragraph.

37. Repayment on the Promissory Note was supposed to begin on July 25, 2015 and continue monthly thereafter with monthly payments of $1062.35 for 60 months. Neither CHICAGO DANCE FACTORY LLC nor WONG have made any payments on the Promissory Note despite repeated demands.

**RESPONSE:** Defendant admits that the terms of terms of the promissory note speak for themselves. Defendant denies the remaining allegations of this paragraph.

38. At the time WRZESINSKI gave the initial funds to WONG, WRZESINSKI believed that the funds were going to be used solely for the purposes stated in the Prospectus, as noted above, and not for construction costs of the dance studio nor for the personal expenditures and debt payments of WONG.

**RESPONSE:** Denied.

39. For the next several weeks and months WONG reported periodically to WRZESINSKI that the project was coming along well. These statements were also false in that Wong was experiencing difficulties in working with the Village of Palatine on permitting, and with the contractor and the architect.

**RESPONSE:** Denied.

40. However, sometime in September of 2015, WONG reported to WRZESINSKI that construction was taking longer than expected, and that the build-out was going to be more expensive than previously stated. WONG asked WRZESINSKI to invest more money in the project, at which point it became clear that WONG has misused the originally lent $50,000.00. On September 28, 2015, in reliance on WONG's statements that any subsequently lent money would be used solely for building out the studio space, and also for obtaining a liquor license, WRZESINSKI, for the purpose of trying to salvage his initial investment, lent DANCE FACTORY LLC an additional $50,000.00 (via a $25,000.00 check and $25,000.00 in cash).

**RESPONSE:** Defendant admits that plaintiff loaned the additional $50,000, but denies each and every other allegation in this paragraph.

41. For the same reason, WRZESINSKI lent CHICAGO DANCE FACTORY LLC an additional $10,000.00 on January 19, 2016, including $9,000.00 in cash and a check for $1,000.00 payable to WONG individually. All totaled, WRZESINSKI lent CHICAGO DANCE FACTORY LLC and WONG $110,000.00 dollars.

**RESPONSE:** Defendant admits that plaintiff loaned the additional $10,000 but denies each and every other allegation in this paragraph.

42. When WRZESINSKI lent CHICAGO DANCE FACTORY LLC and WONG these additional funds, WRZESINSKI and WONG orally agreed that the money would be repaid in full with the 10% interest agreed upon from the original Promissory Note and Guarantee.

**RESPONSE:** Denied.

43. After that second loan, WRZESINSKI began questioning WONG's ability to complete construction on the Project and start operating the business, both to WONG and to interested third parties. For example, WRZESINSKI spoke multiple times with John Silva, the general construction contractor, about the build-out's status. Silva reported to WRZESINSKI that WONG did not initially have proper permits; and that WONG's architectural plans were not drawn in conformity with existing codes, thus necessitation a re-draft of them, a re-application for permits, and resultant delays in the project.

**RESPONSE:** Defendant lacks sufficient information with which to admit or deny the allegations of this paragraph.

44. WRZESINSKI also heard from third parties that WONG was spending the money on non-Project related items, including but not limited to child support payments for an employee of his other dance studio - the sole proprietorship Chicago Dance Factory; a trip to downtown Chicago with employees of that studio to see a show and have dinner, trips to Las Vegas, and expensive dinners.

**RESPONSE:** Defendant lacks sufficient information with which to admit or deny the allegations of this paragraph.

45. In addition, starting in the Fall of 2015, WRZESINSKI demanded to WONG on multiple occasions that WONG provide an accounting of how the initial $50,000.00 loan to CHICAGO DANCE FACTORY LLC was spent. WONG did not provide such an accounting to WRZESINSKI until April 25, 2016, after WRZESINSKI's attorney obtained them from WONG's attorney.

**RESPONSE:** Denied.

46. Eventually, based on WRZESINSKI's on-site review of the project, his discussions with the landlord and the general contractor John Silva, and others, WRZESINSKI concluded in late January of 2016 that WONG was using the lent funds for purposes other than those stated in the Prospectus or otherwise related to the build-out of the Project, and that WONG was in breach of, and was incapable of meeting his obligation to repay the lent funds to WRZESINSKI pursuant to the Promissory Note, the lending of the additional funds, and the statements in the Prospectus.

**RESPONSE:** Plaintiff lacks sufficient information with which to admit or deny what plaintiff "concluded," but plaintiff denies each and every remaining allegation in this paragraph.

47. In fact, by the middle or end of January it became clear to WRZESINSKI that WONG had abandoned the project without informing him.

**RESPONSE:** Plaintiff lacks sufficient information with which to admit or deny what "became clear" to plaintiff, but denies each and every remaining allegation in this paragraph.

48. As time passed after WRZESINSKI's initial loan of $50,000.00 to CHICAGO DANCE FACTORY LLC, WRZESINSKI discovered that WONG had been using many of the lent funds for WONG's personal use, to finance and operate WONG's unrelated dance studio

business and a separate entertainment show-like business unrelated to the investment called "Masquerade Ball" (being a dinner-theater type event), and for other non-Project personal purposes.

**RESPONSE:** Defendant denies that plaintiff "discovered" what the loaned funds were used for "as time passed." Defendant was aware of the exact nature of the expenditures during the entire process.

49. Bank account records and an accounting prepared by WONG show that WONG commingled WRZESINSKI's lent funds with WONG's own personal funds, and spent them for his own personal use and for the use of CHICAGO DANCE FACTORY LLC and/or CHICAGO DANCE FACTORY INC. for items such as, but by no means limited to, the following examples as admitted to by WONG in the accounting:

"Payment to personal credit card" (multiple entries); "Jami Davis - Child Support" (WONG's child, multiple entries); "Kat's competition dress" (multiple entries); "full cast dinner" for an unrelated show he was producing; payroll for the dancers in the unrelated show; "retrieved Brandy Cull's vehicle from Tow Company [sic]" and in taking Brandy Cull on a trip to Las Vegas. There are multiple payments for "Gaylord Opryland Restaurant" in Nashville, TN and other charges in Kentucky and Tennessee.

**RESPONSE:** Defendant admits the quoted language from the accounting, but denies the remaining allegations of this paragraph.

50. Additionally WONG used the funds to make payroll and pay back payroll for his Villa Park dance studio operated ostensibly by his sole proprietorship CHICAGO DANCE FACTORY on multiple occasions.

**RESPONSE:** Defendant admits that funds were used to make payroll and pay back payroll, but denies the remaining allegations of this paragraph.

51. There's charges for the Blue Man Group show in Chicago; Westgate Resort and Casino in Las Vegas; airport rental van in Las Vegas; MGM Theater tickets in Las Vegas; the buffet at the Bellagio; Benihana in Las Vegas; multiple charges to Spirit Airlines (noted by WONG himself as "Las Vegas Flights for crew").

**RESPONSE:** Defendant lacks sufficient information with which to admit or deny the allegations of this paragraph because it is unclear and unartfully drafted, but plaintiff admits that funds were spent on trips and events for students.

52. There's additional charges for "Tommy Gun's Garage" for "research on Competitor Show" and almost $100 for chocolates. There is $390 for "passports for travel to Dance Events [sic] outside of the country."

**RESPONSE:** Defendant lacks sufficient information with which to admit or deny the allegations of this paragraph because it is unclear and unartfully drafted, but plaintiff admits that funds were spent on inventory and research on a competitor show.

53. All of the aforesaid expenditures were unrelated to the purposes for which WRZESINSKI lent the funds to WONG and CHICAGO DANCE FACTORY LLC and as delineated in the Prospectus.

**RESPONSE:** Denied.

54. During the course of the Cook County Case, WONG admitted in discovery that he commingled the lent funds with his personal funds and funds of CHICAGO DANCE FACTORY LLC and/or CHICAGO DANCE FACTORY INC.

**RESPONSE:** Defendant admits that a portion of the loaned funds were paid to him as salary.

55. As of the date of filing this Compliant, WONG has failed to make a single payment to WRZESINSKI pursuant to the Promissory Note or their oral agreements for repayment of the additional funds. Wong has not paid any monies on the judgment obtained in the Cook County litigation, either.

**RESPONSE:** Admit.

56. WRZESINSKI has expended good and valuable sums of money on attorney's fees in attempting to collect these sums from the defendant, which to date exceed $10,000.00 and continues to increase.

**RESPONSE:** Defendant lacks sufficient information with which to admit or deny the allegations of this paragraph.

57. All or part of the debt claimed herein up to the full $110,000.00 is non-dischargeable because it is a debt for money that was obtained through false pretenses, false representation and actual fraud within the meaning of the Bankruptcy Code § 523(a)(2)(A), (B).

**RESPONSE:** Denied.

58. All or part of the judgment obtained in the Circuit Court Case is non-dischargeable because it is a debt for money that was obtained through false pretenses, false representation and actual fraud within the meaning of the Bankruptcy Code § 523(a)(2)(A), (B).

**RESPONSE:** Denied

WHEREFORE, defendant, Norman Brian Wong, moves for the entry of an order dismissing plaintiff's complaint with prejudice, and for such other and further relief deemed fair and reasonable by this Honorable Court.

                                                DREYER, FOOTE, STREIT,
                                                FURGASON & SLOCUM

                                                By /s/ Michael W. Huseman
                                                          Attorneys for Defendant

Michael W. Huseman
Attorney No. 06280259
DREYER, FOOTE, STREIT,
FURGASON & SLOCUM
1999 West Downer Place
Aurora, IL 60506
630/897-8764
mhuseman@dreyerfoote.com

**PROOF OF SERVICE**

      I, Michael W. Huseman, at attorney, certify that pursuant to Section II, B, 4 of the Administrative Procedures for the Case Management/Electronic Case Filing System, service of the above Answer to Plaintiff's First Amended Complaint, was accomplished on the following individuals through the Court's Electronic Notice for Registrants, and through regular mail for non-registrants, before the hour of 5:00 P.M., December 13, 2019.

    Michael Palermo
    Palermo Law Firm
    99 Ascension Dr. J103
    Asheville, NC 28806
    palermo@palermolaw.com

                                              /s/ Michael W. Huseman
                                                    Attorneys for Defendant